UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| MELISSA J. MYERS, | ) | |
| (Social Security No. XXX-XX-8197), | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 4:08-cv-64-WGH-DFH |
| | ) | |
| MICHAEL J. ASTRUE, COMMISSIONER | ) | |
| OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM DECISION AND ORDER[1]

This matter is before the Honorable William G. Hussmann, Jr., United

States Magistrate Judge, upon the Consents filed by the parties (Docket Nos. 8,

10) and an Order of Reference entered by Chief Judge David F. Hamilton on July

14, 2008 (Docket No. 13).

### I.  Statement of the Case

Plaintiff, Melissa J. Myers, seeks judicial review of the final decision of

the agency, which found her not disabled and, therefore, not entitled to

Disability Insurance Benefits ("DIB") or Social Security Income ("SSI") under the

Social Security Act ("the Act").  42 U.S.C. §§ 416(i), 423(d), 1381; 20 C.F.R. §

---

[1]Due to the entry of this Memorandum Order and Decision, the oral argument
set in this matter on July 10, 2009, is **VACATED.**

404.1520(f).  This court has jurisdiction over this action pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3).

Plaintiff initially applied for DIB and SSI on February 9, 1999, but that claim was denied on February 19, 2000; Plaintiff did not appeal and subsequently engaged in substantial gainful activity.  (R. 22).  Plaintiff again applied for DIB and SSI on June 27, 2003, alleging disability since May 26, 2003.  (R. 64-66, 126-33).  The agency denied Plaintiff's application both initially and on reconsideration.  (R. 22).  Plaintiff appeared and testified at a hearing before Administrative Law Judge James Norris ("ALJ") on May 14, 2007.  (R. 712-53).  Plaintiff was represented by an attorney; also testifying was a vocational expert ("VE") and two medical experts ("ME").  (R. 712).  On July 11, 2007, the ALJ issued his opinion finding that Plaintiff was not disabled because she retained the residual functional capacity ("RFC") to perform her past work. (R. 22-34).  After Plaintiff filed a request for review, the Appeals Council denied Plaintiff's request, leaving the ALJ's decision as the final decision of the Commissioner.  (R. 2-4).  20 C.F.R. §§ 404.955(a), 404.981.  Plaintiff then filed a Complaint on May 6, 2008, seeking judicial review of the ALJ's decision.

## II.  Statement of the Facts

### A.  Vocational Profile

Plaintiff was 46 years old at the time of the ALJ's decision and had a high school education.  (R. 28).  Her past relevant work experience included work as a

cashier, fast food worker, and mail clerk, which was light unskilled work.  (R. 746).

## B.  Medical Evidence

### 1.  Plaintiff's Physical Impairments

Medical records document that in May 2003 Plaintiff experienced a subtle, non-displaced skull fracture and multiple facial bone fractures from a moped accident.  (R. 648-56, 678-79).  On May 27, 2003, x-rays did not show any acute injury to Plaintiff's cervical spine, and a CT showed no acute intracranial injury. (R. 653-54).

On June 24, 2003, Plaintiff was seen by Daniel A. Walters, M.D.; she was only one month removed from the moped accident.  (R. 326-27).  Plaintiff reported pain and pressure in her right face, confusion, ataxia, dizziness, and nausea.  (R. 326).  She also had anxiety and depression secondary to her accident and reported experiencing blackouts.  (R. 326).  An examination of Plaintiff revealed ataxia and difficulty with tandem walking.  (R. 326).

On July 16, 2003, Plaintiff again visited Dr. Walters.  (R. 321-22).  Plaintiff reported earache and insomnia, and was being treated for depression with Lexapro.  (R. 321).  It was noted that Plaintiff was a one-pack-per-day smoker. (R. 321).  A mental status examination revealed some slowing of her thought process and difficulty keeping on track.  (R. 321).

On September 12, 2003, Plaintiff visited Dr. Walters.  (R. 319).  She was experiencing intermittent dizziness with occasional blackouts and persistent

headaches since the May 2003 moped accident.  It was also indicated that Plaintiff previously had difficulty with depression.  (R. 319).  Plaintiff had obtained little relief from medication.  (R. 319).

On September 16, 2003, Plaintiff's treating specialist, Anthony D. Sanders, M.D., saw her for complaints of persistent pain in the ear and neck area, dizziness, and blackouts/loss of consciousness when turning her head.  (R. 317). An examination of Plaintiff revealed normal results, and Dr. Sanders ordered a carotid ultrasound, audiogram, and ENG.  (R. 317).

On September 27, 2003, Plaintiff underwent a physical consultative evaluation by Elpidio Feliciano, M.D.  (R. 644-45).  Plaintiff's exam revealed normal results in gait, posture, muscle strength, range of motion, grip strength, and normal extremities.  (R. 645).  Dr. Feliciano described Plaintiff as obese and noted that her main complaint was that she suffered from headaches.  (R. 645).

On October 15, 2003, Plaintiff underwent a "bilateral carotid duplex doppler with vertebrals," which was within normal limits.  (R. 159).

On November 3, 2003, Dr. Sanders described Plaintiff's symptoms as gradually improving.  (R. 313).  Plaintiff no longer experienced syncopal episodes, and her dizziness was getting better.  Examination of Plaintiff, including an ENG which revealed Dix-Hallpike's, as well as caloric nystagmus testing, was positive for vertigo.  Dr. Sanders hoped Plaintiff could return to work soon, but if she were to fail to make complete recovery, then more intensive vestibular (inner ear) rehab would be necessary.  (R.  313).

On November 6, 2003, Plaintiff was seen at the Schneck Medical Center with complaints of "blacking out" and dizziness after a skull fracture from a moped accident.  (R. 179-80).  Plaintiff was diagnosed with vertigo.  (R. 179).  Plaintiff claimed that she needed help with caring for her son.  (R. 179).  Plaintiff also complained of pain in her neck that goes down into her lower back and that her right side goes numb at times.  An examination revealed that Plaintiff had difficulty keeping her eyes focused with constant blinking and rolling of her eyes.  (R. 179).  An examination of Plaintiff's neck revealed that she had pain with neck extension but otherwise normal results.  Plaintiff also reported constant headaches.  (R. 180).  Plaintiff was positive for positional vertigo with occulomotor deficits; she was not able to tolerate testing.  (R. 180).

On November 10, 2003, Plaintiff visited Dr. Walters for vertigo and chronic headaches.  (R. 310-11).  Plaintiff suffered from post-traumatic headaches since her May 2003 moped accident.  (R. 310).  Plaintiff noted that she was informed that her inner ear was causing her vertigo.  (R. 310).  Ibuprofen was helpful for her headaches, and Valium helped with her dizziness.  (R. 310).

On December 9, 2003, plaintiff visited Dr. Walters for follow-up of chronic dizziness and lightheadedness.  (R. 583-84).  Plaintiff reported decreased headaches and improvement in her dizziness.  (R. 583).  Plaintiff did report significant pain in her lower back as well as tingling/numbness in her left foot; Plaintiff was also being treated for depression.  (R. 583).  An exam of Plaintiff's extremities was normal.  (R. 383).

On February 3, 2004, Plaintiff visited Dr. Walters.  (R. 458-60).  Plaintiff complained of chronic vertigo and depression.  Examination of Plaintiff revealed tenderness in her neck, but good range of motion.  (R. 459).  She also had marked tenderness in her right sacroilliac joint.  (R. 459).  Dr. Walters noted that Plaintiff's vertigo was markedly improved from six months earlier.  He did recommend injections for Plaintiff's sacroiliitis.  (R. 459).  On February 26, 2004, Plaintiff visited Dr. Walters with increasing back pain and radicular pain into her right leg.  (R. 462).  Plaintiff's ataxia and vertigo were "almost completely resolved."  (R. 462).  Plaintiff attempted to return to work, but she experienced the low back pain and radicular pain upon exertion.  Dr. Walters ordered an MRI of Plaintiff's lumbar spine.  (R. 462).

A February 28, 2004, MRI of Plaintiff's lumbar spine revealed mild L5-S1 degenerative disc disease with disc desiccation, mild disc bulging, and mild central disc bulge/protrusion, as well as mild lower lumbar facet arthrosis.  (R. 168).

On May 12, 2004, Plaintiff was seen at the Schneck Medical Center Pain Clinic with complaints of several years of low back pain.  (R. 277-78).  Plaintiff's pain radiates to her lower extremities causing numbness.  (R. 277).  Walking, standing, bending, lifting, and prolonged sitting worsen the pain.  (R. 277).  On May 25, 2004, Plaintiff underwent physical therapy for a herniated disc, degenerative disc disease, and low back pain; examination revealed increased lumbar lordosis with sacral flexion.  (R. 281).  It was further indicated that

Plaintiff suffered from SI dysfunction, which was leading to pain as well as decreased mobility and function.  (R. 305).  Plaintiff also had increased swelling and soreness in her left foot.  (R. 305).

On May 29, 2004, Plaintiff was seen by Stephanie Johnson, M.D., with complaints of peripheral edema.  (R. 471).  An exam did reveal edema in Plaintiff's left foot; Dr. Johnson recommended the use of support hose.  (R. 471).

On June 17, 2004, August 12, 2004, and November 11, 2004, Plaintiff underwent lumbar epidural steroid injections.  (R. 393, 395, 402).

On July 28, 2004, Plaintiff visited Dr. Walters, who noted that Plaintiff had chronic post-traumatic headaches, chronic vertigo, and chronic depression with anxiety, as well as allergic rhinitis.  (R. 446).  Plaintiff was also being treated for peripheral edema.  (R. 446).  Some of Plaintiff's headaches were associated with photophobia, phonophobia, and nausea.  Plaintiff complained of knee pain following a physical altercation.  (R. 446).  Dr. Walters did not describe any unusual findings upon examination, but offered the assessment of osteoarthritis of the knees.  (R. 446).

On August 2, 2004, Plaintiff visited the Schneck Medical Center Pain Clinic with lumbar pain.  (R. 272-73).  A May 12 steroid injection had helped her pain for about two weeks.  Plaintiff was scheduled for other physical therapy and another steroid injection, but those appointments were missed because Plaintiff had been incarcerated for battery.  (R. 272).  Plaintiff did still experience pain in

her lower back, which was aggravated by bending, lifting, or prolonged sitting or standing, as well as walking any distances.  (R. 272).

From August to September 2004, Plaintiff underwent physical therapy for seven sessions with Gayle Crane, PT.  (R. 263).  Ms. Crane indicated that Plaintiff did not show up for two sessions and that she was being discharged for not attending.  Ms. Crane noted that Plaintiff experienced an almost entire improvement in leg pain and some improvement in back pain, and she opined that, had Plaintiff continued therapy, there would have been more improvement. (R. 263).

On September 9, 2004, Plaintiff visited the Schneck Medical Center Pain Clinic for follow-up of lumbar pain.  (R. 268-69).  An August 12 steroid injection had helped her pain for about two weeks.  However, Plaintiff did still experience pain that radiated into her right leg and was worsened with activity.  (R. 268).

On December 16, 2004, Plaintiff visited the Schneck Medical Center Pain Clinic with lumbar pain.  (R. 264-65).  Plaintiff had undergone three epidural steroid injections that helped the pain in her lower back for about a week.  (R. 264).  The pain radiates into her right leg and hip.  Activity worsens Plaintiff's pain.  Plaintiff was taking OxyContin and Percocet for the pain.  (R. 264).

On December 26, 2004, Plaintiff again visited the Schneck Medical Center Pain Clinic.  (R. 407).  Plaintiff displayed tenderness along the lumbar spine.  (R. 407).

On January 19, 2005, Plaintiff returned to Dr . Walters.  (R. 831-32).  Dr. Walters opined that Plaintiff could not do any repetitive bending, lifting, or twisting because of her problems with balance and the effects that such actions would have on her vertigo.  (R. 831).  He also noted Plaintiff's chronic depression, chronic headaches, memory/concentration difficulties, and back pain with radicular symptoms.  (831).

Dr. Walters completed a Physical Residual Functional Capacity Questionnaire on January 31, 2005.  (R. 255-59).  Plaintiff's diagnoses included chronic vertigo, post-traumatic headaches, memory loss, chronic back pain, chronic neck and shoulder pain, fatigue and malaise, and short attention span. (R. 255).  Her primary symptoms included dizziness, balance problems, poor short-term memory, double vision, difficulty following multiple-step instructions, headaches, left shoulder pain, back pain, fatigue, and right leg pain; she was also unable to read, and her eyes would not focus.  (R. 255).  Dr. Walters stated that Plaintiff can only sit for two hours and stand for zero to one hour in an eight-hour workday.  (R. 256).  Furthermore, she can only occasionally lift 10-20 pounds and can never lift over 20 pounds.  (R. 256).

Plaintiff also needed to avoid heights, stooping, pushing, pulling, bending, and kneeling, and had limited vision.  (R. 257).  Dr. Walter noted that Plaintiff had developed depression due to her physical impairments and opined that Plaintiff would miss more than three days of work per month.  (R. 258).  Plaintiff was incapable of even low-stress jobs.  (R. 258).

On January 31, 2005, Plaintiff visited the Schneck Medical Center Pain Clinic for follow-up on her low back pain; Plaintiff had also just recently undergone a hysterectomy.  (R. 177-78).  Plaintiff displayed some tenderness in the paraspinous lumbar spine.  (R. 177).

On March 18, 2005, Plaintiff returned to the Schneck Medical Center Pain Clinic with lumbar pain.  (R. 175-76).  Plaintiff reported sleeping much better since her hysterectomy.  She did report that prolonged walking aggravates her back pain.  (R. 175).

On April 21, 2005, Plaintiff visited Dr. Walters' office for treatment of her chronic allergic rhinitis and chronic dizziness.  (R. 825).  Plaintiff was treated with Prednisone for her rhinitis and Phenergan for the nausea and vomiting associated with her dizziness.  (R. 825).

On May 27, 2005, Plaintiff was seen at the Schneck Medical Center Pain Clinic for a follow-up of her lumbar pain.  (R. 174).  She was diagnosed with lumbar degenerative disc disease and lumbar facet arthrosis.  It was indicated, at the time, that her medications control her pain fairly well and she was having no problems with her medications.  (R. 174).

An MRI of Plaintiff's cervical spine dated July 19, 2005, revealed degenerative disc disease at C5-C6 and C6-C7 resulting in central canal and neuroforaminal stenosis.  (R. 166).

Plaintiff visited the Schneck Medical Center Pain Clinic on July 22, 2005. (R. 172-73).  Her chief complaint was moderate-to-severe lower lumbar pain.

Plaintiff also complained of numbness in her right hand.  (R. 172).  An examination revealed tenderness of Plaintiff's lumbar and cervical paraspinous regions.  Plaintiff had been using both Percocet and OxyContin for pain.  (R. 173).

Plaintiff returned to the Schneck Medical Center Pain Clinic on August 23, 2005, with complaints of cervical and lumbar pain.  (R. 170-71).  Plaintiff's MRI results were discussed, and Plaintiff complained of numbness in her right arm and pain in her neck that radiated into her arms.  (R. 170).  Plaintiff declined epidural steroid injections, but did want a referral to a neurosurgeon.  (R. 170).  An examination of Plaintiff's neck and extremities revealed normal results except for some tenderness along the cervical paraspinous region.  (R. 170).

On September 4, 2005, Dr. Walters completed a Physical Residual Functional Capacity Questionnaire.  (R. 181-85).  He noted a treatment relationship since June 11, 2003.  (R. 181).  Dr. Walters listed Plaintiff's problems as including chronic headaches, post-traumatic vertigo, memory loss, depression, and chronic back pain.  Plaintiff had moderate to severe pain in the lumbar and cervical spine, moderate pain in her right knee, and numbness in her right arm.  (R. 181).  Dr. Walters estimated that Plaintiff's pain was a six to seven on a scale of one to ten and that her fatigue was a seven to eight, and he noted that he could not relieve Plaintiff's pain with medication.  (R. 181).  He opined that Plaintiff was limited to standing from zero to one hour and sitting from zero to one hour in an eight-hour workday.  (R. 182).  Plaintiff could never

lift more than ten pounds and could only occasionally carry that much; Plaintiff also has significant limitations in repetitive reaching, handling, fingering, or lifting.  (R. 182).  Plaintiff displayed limited range of motion in her neck with stiffness; muscle spasms in her neck, trapezious muscle, and lumbar region; and sensory loss in her right arm and leg.  Dr. Walters opined that Plaintiff's neck impairment interfered with her ability to constantly look at a computer screen or look down at a desk.  (R. 183).  Plaintiff also needed to avoid temperature extremes, fumes, humidity, dust, heights, stooping, pushing, pulling, bending, and kneeling.  (R. 183).  Dr. Walters felt that Plaintiff was incapable of even a low-stress job because of severe depression and anxiety, and Plaintiff would miss work more than three times per month.  (R. 184).  Finally, Dr. Walters opined that Plaintiff was permanently disabled, and unable to perform any work on a full-time basis.  (R. 185).

On September 16, 2005, an MRI of Plaintiff's brain was performed which revealed right otomastoiditis of Plaintiff's ear.  (R. 165).

Plaintiff underwent physical therapy at Schneck Medical Center Rehab Services for severe back pain and knee pain from October through December 2005; she discontinued her physical therapy in January 2006 due to pain.  (R. 969-94).

On December 8, 2005, Plaintiff underwent a CT scan of her temporal bones that revealed chronic otitis.  (R. 144).  On March 2, 2006, Plaintiff

underwent a sinus CT scan.  (R. 143).  The results revealed mild to moderate

sinusitis.  (R. 143).

On May 16, 2006, Plaintiff visited the Schneck Medical Center Pain Clinic

where an MRI taken on March 9, 2006 (R. 957) of her lumbar spine was reviewed

(R. 835).  Plaintiff had L5-S1 disc desiccation, central disc bulging, and

indentation of the intrathecal sac, moderate bilateral facet arthrosis with

hypertrophic bony change and ligamentum flavum hypertrophy at L5-S1, and

mild central canal narrowing at L5-S1; there was slight progression of disc

desiccation and disc bulging of L5-S1 when compared to previous exams.  (R.

835).

On June 6, 2006, Dr. Sanders noted that Plaintiff had tympanostomy

tubes placed in her ears.  (R. 834).  Plaintiff exhibited sensory neural hearing

loss.  Dr. Sanders was positive about the fact that Plaintiff had not experienced

bouts of dizziness since the placement of the tubes.  (R. 834).  Plaintiff did,

however, continue to be bothered with sinus symptoms.  (R. 834).

On June 22, 2006, Plaintiff returned to the Schneck Medical Center Pain

Clinic for follow-up of her cervical and lumbar pain.  (R. 833).  Plaintiff described

her pain as a five to seven on a ten-point scale.  An exam revealed cervical and

lumbar tenderness.  (R. 833).  Plaintiff's diagnosis was lumbar and cervical

degenerative disc disease and lumbar facet joint arthrosis.  (R. 833).

On October 13, 2006, Dr. Sanders performed surgery on Plaintiff

including:  bilateral endoscopic complete ethmoidectomies, frontal osteoplasties,

right antrostomies, left maxillary endoscopy with cyst removal, and bilateral SMR of inferior turbinates.  (R. 276-77).

On November 6, 2006, Dr. Walters again completed a Residual Functional Capacity Form in which he described Plaintiff as disabled.  (R. 845-50).  Plaintiff had the following limitations:  the ability to stand/walk for less than two hours with the requirement that she change positions every 20-30 minutes; the ability to sit for less than two hours with the requirement that she not sit for more than 30-45 minutes at a time due to back and leg pain; the ability to apply a TENS unit or ice pad two to three times daily; no bending, twisting, stooping, crouching, squatting or climbing; only rare use of her extremities to push/pull, use foot controls, or reach; and no moderate exposure to dusts/pollens/allergens.  (R. 846-47).  Plaintiff would also have difficulty with the pain associated with exertion, and would become fatigued with exertion requiring breaks.  (R. 848).  Psychologically, Plaintiff would have difficulty with memory, depression, concentration, anxiety, and social withdrawal.  (R. 848-49).  Based on Plaintiff's impairments, Dr. Walters opined that Plaintiff would miss "extensive" time from work.  (R. 849).

## 2.  Plaintiff's Mental Impairments

In order to assist in determination of her eligibility for Medicaid, Plaintiff underwent a mental status examination at Quinco Consulting Associates of Jackson County by Nancy L. Wonacott, Ph.D., on September 18, 2003.  (R. 473-74, 490-92).  Plaintiff reported that her impairments included headaches,

dizziness, nausea, neck pain, drainage from her right ear, and shoulder pain on a daily basis, all as a result of the May 2003 moped accident.  Plaintiff also noticed short-term memory problems.  (R. 491).

Plaintiff also reported a significant history of depression and anxiety; she described her symptoms as follows:  low self-esteem, tearfulness, decreased energy, feelings of worthlessness, hopelessness, difficulty concentrating, and sleep disturbances.  (R. 491).  Plaintiff explained that her depression began with the death of her father in 1998, which left her homeless.  (R. 492).  However, Plaintiff also reported that the death of her mother in 1982 was a significant stressor which resulted in her being required to raise her nine-year-old sister and eventually resulted in the break-up of her first marriage.  (R. 490).  After her father's death, Plaintiff admitted herself for adult psychiatric treatment for one week and was diagnosed with major depressive disorder.  (R. 492).  Additionally, Plaintiff has had several alcohol-related arrests from 1993-1998 including:  five arrests for driving under the influence, two arrests for public intoxication, and several arrests for driving with a suspended license.  Plaintiff served four months in jail in 1999.  (R. 492).  Plaintiff reported still drinking 12 beers a week.  (R. 492).

An examination of Plaintiff revealed a flat affect, possible minor limitations with reasoning that might be exacerbated with alcohol use, an intact memory, and average intellectual abilities.  (R. 473).  Dr. Wonacott found alcohol dependence and major depressive disorder, recurrent, mild.  (R. 474).  Her GAF

was 50.  (R. 474).  Plaintiff continued mental health treatment for her depression with Quinco from September 2003 through March 2006.  (R. 473-94, 761-86).

On September 26, 2003, Plaintiff underwent a mental status exam.  (R. 419-423).  Christopher H. Scruton, Ph.D., noted that memory testing yielded average to low-average memory except for borderline immediate memory, which revealed some concentration/attention problems.  (R. 420).  Plaintiff reported doing housework, shopping, and preparing meals without assistance.  (R. 420).  Dr. Scruton diagnosed adjustment disorder with a mildly depressed mood.  (R. 419).

On November 17, 2006, Dr. Christopher completed a Mental Impairment Questionnaire (RFC & Listings).  (R. 1034-38).  Plaintiff's symptoms included: appetite disturbance with weight change; sleep disturbance; personality change; mood disturbance; emotional lability; psychomotor agitation; feelings of guilt/worthlessness; difficulty thinking or concentrating; social withdrawal or isolation; blunt, flat, or inappropriate affect; decreased energy; generalized persistent anxiety; and hostility and irritability.  (R. 1034).  Dr. Christopher opined that Plaintiff was not malingering.  (R. 1035).  Plaintiff's impairments were reasonably consistent with the symptoms and functional limitations described.  (R. 1035).  On average, Plaintiff would be absent from work more than three times per month.  (R. 1036).  Plaintiff has "poor or no" ability to understand and remember very short and simple instructions, carry out very short and simple instructions, maintain attention for two-hour segments,

complete a normal workday and workweek without interruption from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods.  (R. 1036-37).  Dr. Christopher found "marked" limitations in activities of daily living and maintaining social functioning.  (R. 1037).

A state psychological evaluation was performed by Kimberly A. Green, Ph.D., on January 23, 2007.  (R. 688-92).  Plaintiff reported being in counseling for depression; she had seen a therapist, named Shelly Brummet, for several months.  (R. 688).  Plaintiff reported that she was involved with Child Protective Services for an injury that her son sustained allegedly at the hands of his father. (R. 688-89).  Plaintiff reported being alcohol free "for at least two years."  (R. 689).  Plaintiff was administered the MMPI-2 and the results indicated that Plaintiff "greatly exaggerated her difficulties."  (R. 691).  Plaintiff was angry and resentful and was unlikely to respect the laws and rules of society.  Additionally, Plaintiff was unlikely to take responsibility for her own actions and behavior.  (R. 691).  Dr. Green's conclusions were that Plaintiff's depression was mild, and her attention, concentration, and memory were unimpaired.  (R. 691-92).  Her diagnoses included alcohol dependence in sustained full remission and major depressive disorder, recurrent, mild.  (R. 692).  Her GAF was 53.  (R. 692).

### 3.  State Agency Review

J. Evans, Ph.D., completed a Psychiatric Review Technique form on November 10, 2003.  (R. 608-20).  This document found a non-severe affective

disorder (adjustment disorder).  (R. 608, 611).  Plaintiff was mildly limited in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace.  (R. 618).

On August 22, 2004, a Mental Residual Functional Capacity Assessment was performed.  (R. 529-32).  Plaintiff was moderately limited in:  (1) ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (2) ability to accept instructions and respond appropriately to criticism from supervisors; and (3) ability to respond appropriately to changes in the work setting.  (R. 530).  Plaintiff should also expect some problems with pace, stress tolerance, and response to criticism.  (R. 531).

A Psychiatric Review Technique form was completed on August 22, 2004.  (R. 533-43).  This document indicated affective disorder (major depressive disorder) and substance addiction disorder.  (R. 533, 536).  Plaintiff was mildly limited in activities of daily living and moderately limited in maintaining social functioning and maintaining concentration, persistence, or pace.  (R. 543).

### 4.  Medical Testimony at Plaintiff's Hearing

Dr. Laura Rosch, the internist testifying as medical advisor at Plaintiff's May 2007 administrative hearing, testified that testing including CT scans and hearing evaluations failed to confirm Plaintiff's complaints of positional vertigo. (R. 716).  Dr. Rosch further testified that testing did not reveal an organic basis

for Plaintiff's complaints, and she indicated that Plaintiff's skull fracture had healed well.  (R. 716).  An MRI revealed mild degenerative disc disease affecting Plaintiff's cervical and lumbar spine, but the record did not establish a neurological basis for Plaintiff's complaints of headaches or other neurological deficits.  (R. 716-17).  Dr. Rosch testified that Plaintiff did not meet or equal any listed impairment.  (R. 719).  Dr. Rosch testified that when all of Plaintiff's impairments were considered in combination, she was limited to sedentary work as the result of her cervical, lumbar, and knee symptomatology, but she acknowledged that the record contained little objective evidence to support such a degree of limitation.  (R. 719-21).

Jack Thomas, Ph.D., also testified as medical advisor at Plaintiff's hearing. (R. 725).  Dr. Thomas observed that Plaintiff experienced some deficit of immediate memory, but her condition did not meet or equal any listed impairment.  (R. 726-28, 733).  Dr. Thomas concluded that Plaintiff was not restricted from performing complex tasks or more than simple, repetitive work. (R. 728-29, 734-37).  Dr. Thomas observed that Plaintiff's allegations exceeded what the objective testing showed.  (R. 738).

### III.  Standard of Review

An ALJ's findings are conclusive if they are supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales,* 402 U.S. 389, 401 (1971); see also *Perkins v.*

*Chater,* 107 F.3d 1290, 1296 (7th Cir. 1997).  This standard of review recognizes that it is the Commissioner's duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide questions of credibility. *Richardson,* 402 U.S. at 399-400.  Accordingly, this court may not re-evaluate the facts, weigh the evidence anew, or substitute its judgment for that of the Commissioner.  *See Butera v. Apfel,* 173 F.3d 1049, 1055 (7th Cir. 1999).  Thus, even if reasonable minds could disagree about whether or not an individual was "disabled," the court must still affirm the ALJ's decision denying benefits. *Schmidt v. Apfel,* 201 F.3d 970, 972 (7th Cir. 2000).

## IV.  Standard for Disability

In order to qualify for disability benefits under the Act, Plaintiff must establish that he suffers from a "disability" as defined by the Act.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  The Social Security regulations set out a sequential five-step test the ALJ is to perform in order to determine whether a claimant is disabled.  *See* 20 C.F.R. § 404.1520. The ALJ must consider whether the claimant:  (1) is presently employed; (2) has a severe impairment or combination of impairments; (3) has an impairment that meets or equals an impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) is unable to perform his past relevant

work; and (5) is unable to perform any other work existing in significant numbers in the national economy. *Id.* The burden of proof is on Plaintiff during steps one through four, and only after Plaintiff has reached step five does the burden shift to the Commissioner. *Clifford v. Apfel,* 227 F.3d 863, 868 (7th Cir. 2000).

## V.  The ALJ's Decision

The ALJ concluded that Plaintiff had not engaged in substantial gainful activity since the alleged onset date and that Plaintiff was insured for DIB through June 30, 2008.  (R. 24).  The ALJ continued by finding that, in accordance with 20 C.F.R. § 404.1520, Plaintiff had five impairments that are classified as severe:  mild degenerative disk disease; history of a closed head injury; a dysthymic disorder; a generalized anxiety disorder; and a history of alcohol abuse.  (R. 25).  The ALJ concluded that none of these impairments met or substantially equaled any of the Listings in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 26).  The ALJ then found that Plaintiff retained the following RFC:  lift and carry 50 pounds occasionally and 25 pounds frequently; stand and/or walk six hours in an eight-hour workday; sit at least six hours in an eight-hour workday; and limited to simple repetitive work.  (R. 26).  The ALJ determined that, based on this RFC, Plaintiff could perform her past work as a cashier, mail clerk, and fast-food worker.  (R. 33).  The ALJ, therefore, concluded that Plaintiff was not under a disability.  (R. 33).

## VI.  Issues

Plaintiff has raised five issue.  The issues are as follows:

1.  Whether the ALJ improperly failed to find some of Plaintiff's impairments to be "severe" at step two.

2.  Whether the ALJ improperly failed to give controlling weight to the opinions of Plaintiff's treating physicians.

3.  Whether the ALJ's credibility determination is patently wrong.

4.  Whether the ALJ's assessment of Plaintiff's RFC is supported by substantial evidence.

5.  Whether the ALJ asked proper hypothetical questions to the VE.

**Issue 1:    Whether the ALJ improperly failed to find some of Plaintiff's impairments to be "severe" at step two.**

Plaintiff's first argument is that the ALJ should have found that her vertigo, headaches, and osteoarthritis were severe impairments.  There was nothing improper about the ALJ's failure to label these impairments as severe impairments.  As U.S. District Judge David Hamilton has indicated, "[a]s long as the ALJ proceeds beyond step two, as in this case, no reversible error could result solely from his failure to label a single impairment as 'severe.'  The ALJ's classification of an impairment as 'severe' or 'not severe' is largely irrelevant past step two.  What matters is that the ALJ considers the impact of all of the claimant's impairments-'severe' and 'not severe'-on her ability to work."  *Gordon v. Astrue*, 2007 WL 4150328 at *7 (S.D. Ind. 2007).  Here, because the ALJ

proceeded beyond step two, her failure to label Plaintiff's vertigo, headaches, and osteoarthritis as severe impairments was not an error that requires remand.

**Issue 2:     Whether the ALJ improperly failed to give controlling weight to the opinions of Plaintiff's treating physicians.**

Additionally, Plaintiff finds fault in the ALJ's treatment of the opinions of Plaintiff's treating physicians.  Opinions of a treating physician are generally entitled to controlling weight.  *Clifford v. Apfel,* 227 F.3d 863, 870 (7th Cir. 2000).  However, an ALJ may reject the opinion of a treating physician if it is based on a claimant's exaggerated subjective allegations, is internally inconsistent, or is inconsistent with other medical evidence in the record.  *Dixon v. Massanari,* 270 F.3d 1171, 1177-78 (7th Cir. 2001).  Additionally, 20 C.F.R. § 404.1527 provides guidance for how the opinions of treating and nontreating sources are to be evaluated and explains as follows:

> (d)  *How we weigh medical opinions.*  Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
>
> (1)  *Examining relationship.*  Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
>
> (2)  *Treatment relationship.*  Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual

examinations, such as consultative examinations or brief hospitalizations.  If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.  When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion.  We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(i)  *Length of the treatment relationship and the frequency of examination.*  Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.  When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(ii)  *Nature and extent of the treatment relationship.*  Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion.  We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.  For example, if your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain.  When the treating source has reasonable knowledge of your impairment(s), we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(3)  *Supportability.*  The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.  The better an explanation a source provides for an opinion, the more weight we will give that opinion.

Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions.  We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

(4)  *Consistency.*  Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5)  *Specialization.*  We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6)  *Other factors.*  When we consider how much weight to give to a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion.  For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

*****

(f)  *Opinions of nonexamining sources.*  We consider all evidence from nonexamining sources to be opinion evidence. When we consider the opinions of nonexamining sources, we apply the rules in paragraphs (a) through (e) of this section. In addition, the following rules apply to State agency medical and psychological consultants, other program physicians and psychologists, and medical experts we consult in connection with administrative law judge hearings and Appeals Council review:

> (1)  In claims adjudicated by the State agency, a State agency medical or psychological consultant (or a medical or psychological expert (as defined in § 405.5 of this chapter) in claims adjudicated under the procedures in part 405 of this chapter) will consider the evidence in your case record and make findings of fact about the medical issues, including, but not limited to, the existence and severity of your impairment(s), the existence and severity of your symptoms, whether your impairment(s) meets or equals the requirements for any impairment listed in appendix 1 to this subpart, and your residual functional capacity.  These administrative findings of fact are based on the evidence in your case record but are not themselves evidence at these steps.

20 C.F.R. § 404.1527.  In this case, it appears that Plaintiff's treating physicians included Dr. Walters and Dr. Sanders.  Dr. Walters treated Plaintiff for symptoms associated with chronic allergic rhinitis for several years.  (R. 446, 825).  A March 2006 CT scan revealed sinusitis (R. 143), and Plaintiff eventually had to have surgery performed by Dr. Sanders on her inflamed sinuses in October 2006 (R. 276-77).  Based on Plaintiff's allergy problems, in September 2005, and again in November 2006, Dr. Walters opined that Plaintiff should avoid dusts and fumes, and believed that Plaintiff should not have even moderate exposure to pollens or other allergens.  The ALJ did not even address Plaintiff's requirement for surgery, and there is no objective medical evidence to contradict these opinions about Plaintiff's exposure to such allergens.  The opinions of Dr. Walters on this matter are thus well supported by the medical evidence and should have been granted controlling weight.

Next, the court must grapple with the opinions surrounding Plaintiff's vertigo.  There are numerous portions of the record that appear to support a

diagnosis of vertigo.  In November 2003, Dr. Sanders found symptoms that were vertigo-related including an ENG which revealed Dix-Hallpike's, as well as caloric nystagmus testing that was positive for vertigo, and he opined that Plaintiff may need additional vestibular (inner ear) treatment if her condition did not improve. (R. 313).  In April 2005, Plaintiff was treated by Dr. Walters with Phenergan for the nausea and vomiting associated with her chronic dizziness.  (R. 825).  A September 2005 MRI of Plaintiff's brain revealed otomastoiditis of Plaintiff's ear. (R. 165).  In December 2005, Plaintiff underwent a CT scan that revealed *chronic* otitis.  (R. 144).  In June 2006, it was noted that Plaintiff had tympanostomy tubes placed in her ears (R. 834); these tubes are common for inner ear infections.  Based on objective medical evidence, Dr. Walters opined in January 2005 that Plaintiff could not do any repetitive bending, lifting, or twisting because of her problems with balance and the effects that such actions would have on her vertigo.  (R. 831-32).  There has been no objective medical evidence presented that contradicts this opinion.  Because the objective medical evidence reveals that Plaintiff has battled chronic vertigo to the extent that she required surgery to place tubes in her ears, the opinions of Dr. Walters are supported by the objective medical evidence, and they should have been given controlling weight.

**Issue 3:      Whether the ALJ's credibility determination is patently wrong.**

Plaintiff also argues that the ALJ conducted an improper determination of Plaintiff's credibility.  An ALJ's credibility determination will not be overturned

unless it is "patently wrong."  *Powers v. Apfel,* 207 F.3d 431, 435 (7th Cir. 2000).
However, here the ALJ's "credibility" decision is not only an analysis of Plaintiff's
credibility, but also an evaluation of Plaintiff's complaints of pain.  Therefore, the
ALJ must consider SSR 96-7p, the regulation promulgated by the Commissioner
to assess and report credibility issues, as well as 20 C.F.R. § 404.1529(c)(3).

SSR 96-7p states that there is a two-step process that the ALJ engages in
when determining an individual's credibility:

> First, the adjudicator must consider whether there is an underlying
> medically determinable physical or mental impairment(s)--i.e., an
> impairment(s) that can be shown by medically acceptable clinical
> and laboratory diagnostic techniques--that could reasonably be
> expected to produce the individual's pain or other symptoms.  The
> finding that an individual's impairment(s) could reasonably be
> expected to produce the individual's pain or other symptoms does
> not involve a determination as to the intensity, persistence, or
> functionally limiting effects of the individual's symptoms.  If there is
> no medically determinable physical or mental impairment(s), or if
> there is a medically determinable physical or mental impairment(s)
> but the impairment(s) could not reasonably be expected to produce
> the individual's pain or other symptoms, the symptoms cannot be
> found to affect the individual's ability to do basic work activities.

> Second, once an underlying physical or mental impairment(s) that
> could reasonably be expected to produce the individual's pain or
> other symptoms has been shown, the adjudicator must evaluate the
> intensity, persistence, and limiting effects of the individual's
> symptoms to determine the extent to which the symptoms limit the
> individual's ability to do basic work activities.  For this purpose,
> whenever the individual's statements about the intensity,
> persistence, or functionally limiting effects of pain or other
> symptoms are not substantiated by objective medical evidence, *the
> adjudicator must make a finding on the credibility of the individual's
> statements based on a consideration of the entire case record.  This
> includes the medical signs and laboratory findings, the individual's
> own statements about the symptoms, any statements and other
> information provided by treating or examining physicians or*

> *psychologists and other persons about the symptoms and how they*
> *affect the individual, and any other relevant evidence in the case*
> *record.*  This requirement for a finding on the credibility of the
> individual's statements about symptoms and their effects is reflected
> in 20 CFR 404.1529(c)(4) and 416.929(c)(4).  These provisions of the
> regulations provide that an individual's symptoms, including pain,
> will be determined to diminish the individual's capacity for basic
> work activities to the extent that the individual's alleged functional
> limitations and restrictions due to symptoms can reasonably be
> accepted as consistent with the objective medical evidence and other
> evidence in the case record.

SSR 96-7p (emphasis added).  SSR 96-7p further provides that the ALJ's

decision regarding the claimant's credibility "must contain specific reasons for

the finding on credibility, supported by the evidence in the case record, and

must be sufficiently specific to make clear to the individual and to any

subsequent reviewers the weight the adjudicator gave to the individual's

statements and the reasons for that weight."  *Id.*

Moreover, 20 C.F.R. § 404.1529(c)(3) states that when a claimant's

subjective individual symptoms, such as pain, are considered, several factors are

relevant including:  (1) the individual's daily activities; (2) the location, duration,

frequency, and intensity of the individual's pain or other symptoms; (3) factors

that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness,

and side effects of any medication the individual takes or has taken to alleviate

pain or other symptoms; (5) treatment, other than medication, the individual

receives or has received for relief of pain or other symptoms; (6) any measures

other than treatment the individual uses or has used to relieve pain or other

symptoms; and (7) any other factors concerning the individual's functional

limitations and restrictions due to pain or other symptoms.  20 C.F.R. §

404.1529(c)(3)(i)-(vii).

In this case, the ALJ's credibility determination is as follows:

After considering the evidence of record, the Administrative Law
Judge finds that the claimant's medically determinable impairments
could reasonably be expected to produce the alleged symptoms, but
that her statements concerning the intensity, persistence, and
limiting effects of these symptoms are not entirely credible.  It must
be noted that the claimant has not required surgery to her neck or
back and that she has been treated with only conservative
measures.

The claimant has been prescribed medication for pain relief and
depression (Exhibit 2F, page 3), and she has received injections for
pain control through a pain management clinic (Exhibit 1F, pages
30 through 38, 78 through 86, 105 through 112, 120 through 137,
165 through 166, 249 through 266 and 289 through 290).  Dr.
Rosch noted at the hearing that the claimant had been prescribed
some narcotic pain medication, which is usually a [sic] not a
treatment in the first-line of therapy.  The claimant has also received
counseling for her mental symptoms (Exhibit 2F, page 2).

There is no indication that the claimant has any significant side
effects as a consequence of her medication use . . . .  Her history of
medical treatment and her prescribed medications do not support a
conclusion that the claimant has a complete inability to function.
Moreover, the claimant's daily activities reflect an ability to do work
activities.

The claimant's testimony at the hearing was aided by the use of
several leading questions from her attorney, and she testified that
the moped accident changed her life to the extent that she cannot
even function for a full day without difficulty, her written statements
suggest otherwise.  In February of 2004 the claimant disclosed that
she cooked and did laundry and house cleaning (Exhibit 1E, pages
10 through 12).  Patricia Deppe also reported that the claimant got
her son up and off for school and took good care of him.  Ms. Deppe
stated that she visited occasionally with the claimant and gave her
rides to the store or to pay her bills.  (Exhibit 1E, page 13).

The claimant's testimony was generally in conflict with the medical
reports and the other observations and evidence of record.  The
claimant's representative attempted to minimize the testimony
conflicts with the use of leading questions.  For example, although
the claimant stated she could not sit "very long," she [sic] claimant
was able to sit with no apparent discomfort throughout the hearing.
The claimant did not allege that she could not recall her symptoms
on the day of the hearing.  Rather, she gave thoughtful testimony
that was not limited in time and reflected an ability to recall past
events.  Her testimony suggested that her limitations in functioning
have remained constant during the entire period at issue, and did
not even imply an improvement in her alleged memory deficit.  Yet,
in February of 2004 she reported differently (Exhibit 1E, pages 10
through 12).  Also, in September of 2004 a physical therapist
reported that the claimant had been mowing her yard, an activity
that requires more than a minimum of memory of how to start and
operate a lawn mower (Exhibit 1F, pages 142 and 221).

The use of leading questions by the claimant's representative, as
well as the conflicts concerning the claimant's testimony at the
hearing, warrants giving the claimant's subjective complaints little
to no weight in assessing her residual functional capacity.  By
definition, leading questions suggest the answer sought.  As such,
such testimony is less the testimony of the witness and more the
testimony of the attorney, who, of course, is not allowed to function
both as a representative and a witness.  Therefore, it is difficult to
give the claimant's testimony any significant weight in light of all the
inconsistencies and she is found not to be a credible witness in her
own behalf.

(R. 29-31).

Here, the court finds several portions of the ALJ's assessment of Plaintiff's

credibility problematic.  First, the ALJ made his own observations of Plaintiff at

the hearing which were flawed.  The ALJ determined that Plaintiff's memory

seemed to be intact because she could remember her symptoms.  However, the

medical evidence does not reveal problems with Plaintiff's long-term memory;

rather, her short-term memory was impaired.  And, an ALJ is simply not

qualified to determine whether or not someone with short-term memory problems could remember the things that Plaintiff remembered.  Additionally, the ALJ observed that Plaintiff was able to sit for the entire hearing.  But, the observation that Plaintiff was able to sit for a hearing on one occasion does not suggest that Plaintiff's testimony about her ability to sit/stand/walk for an eight-hour workday was not credible.

Second, the court finds fault in the ALJ's characterization of Plaintiff's treatment as "conservative."  For her cervical/lumbar pain, Plaintiff has engaged in what appears to be every type of treatment available except surgery – she has had several rounds of steroid injections; she has undergone numerous physical therapy sessions; she has been prescribed a TENS unit, which Dr. Walters opined she would need to apply two or three times each day at work; and she has been prescribed narcotic medication including a prescription for morphine.  Additionally, Plaintiff has undergone two surgeries – her inner ear/vertigo problems were serious enough that they required the surgical implantation of tubes, and it appears that her sinusitis/headache problems became so severe that she underwent a major sinus surgery performed by Dr. Sanders.  Curiously, the ALJ does not appear to even acknowledge that Plaintiff underwent either of these surgeries.

Third, the court takes issue with the ALJ's examination of Plaintiff's daily activities.  The ALJ explains that Plaintiff's statements about her daily activities suggest that she can function for a full day without any difficulty.  However, the

daily activities report that the ALJ relies on clearly indicates that, because of pain, dizziness, and forgetfulness, Plaintiff is limited in her ability to cook, clean, and do laundry; that she does not engage in other household chores; that it takes her all day to perform these chores; and that she has had a friend help her with these chores in the past.  (R. 103-05).

Because the ALJ improperly relied on his own observations of Plaintiff, did not rely on all of Plaintiff's physical impairments, and mischaracterized Plaintiff's daily activities, the court concludes that the ALJ's credibility determination was patently wrong.  On remand, the ALJ must take into consideration all of Plaintiff's impairments, including her vertigo and chronic headaches, in determining whether or not Plaintiff is credible.

**Issue 4:       Whether the ALJ's assessment of Plaintiff's RFC is supported by substantial evidence.**

Plaintiff's next claim is that the ALJ conducted an improper assessment of Plaintiff's RFC by failing to incorporate some of Plaintiff's impairments.  As the court has already determined that the ALJ should have given controlling weight to the opinions of Plaintiff's treating physicians regarding her vertigo and her need to avoid allergens, the ALJ's RFC determination is flawed.  On remand, the ALJ will need to incorporate these impairments into Plaintiff's RFC.  Additionally, the court notes that the ALJ determined that Plaintiff retained the RFC to lift 50 pounds occasionally and 25 pounds frequently.  However, there is *no* medical evidence in the record to support this RFC.  Plaintiff clearly has provided objective medical evidence that she has a back impairment.  And, in January

2005, Dr. Walters opined that Plaintiff could never lift more than 20 pounds. Eight months later, in September 2005, he opined that Plaintiff was restricted to lifting no more than ten pounds.  The ALJ does not have to accept these limitations, but, in order for him to determine that Plaintiff has such an RFC, there must be some medical evidence in the record that suggests that Plaintiff can lift 50 pounds.  On remand, the ALJ  must provide objective medical evidence to support Plaintiff's RFC.

**Issue 5:      Whether the ALJ asked proper hypothetical questions to the VE.**

Finally, Plaintiff argues that the ALJ did not ask proper hypothetical questions of the VE.  An ALJ is entitled to rely on the testimony of a VE so long as the hypothetical question asked is supported by a complete listing of all limitations supported by substantial evidence in the record.  *Steele v. Barnhart,* 290 F.3d 936, 942 (7th Cir. 2002).  In this case, the ALJ never even asked any hypothetical questions whatsoever.  On remand, the ALJ must ask a hypothetical question to the VE that incorporates *all* of Plaintiff's limitations.

## VII.  Conclusion

Although it is far from clear that Plaintiff is disabled, the record here does not allow the court to trace the path of the ALJ's reasoning.  The court concludes that this case must be **REMANDED** for further analysis.  The ALJ must give controlling weight to the opinions of Plaintiff's treating physicians regarding her vertigo and her avoidance of allergens.  The ALJ must also re-examine Plaintiff's credibility, taking into consideration all of Plaintiff's impairments.  Furthermore,

the ALJ must incorporate all of Plaintiff's impairments into his assessment of Plaintiff's RFC.  Finally, the ALJ must ask a proper hypothetical question to the VE which includes a complete list of Plaintiff's limitations.

  **SO ORDERED** this 18th day of June, 2009.

                _____
                WILLIAM G. HUSSMANN, JR.
                  Magistrate Judge

**Electronic copies to:**

Steven K. Robison
MONTGOMERY ELSNER & PARDIECK
srobison@meplegal.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov